(8 App. Div. 160)

BURDEN v. BURDEN et al.

(Supreme Court, Appellate Division, Third Department. July 7, 1896.)

. CORPORATIONS—CONTRACTS OF PROMOTERS—WHEN BINDING ON CORPORATION.
Where the promoters and incorporators are the same persons, and are the only stockholders and trustees, and so continue for several years, a contract made by them before organization, and acted on afterwards, is binding on the corporation.

SAME—INTERPRETATION OF CONTRACT.
An agreement between plaintiff and defendant, who were promoters of a corporation, and contributors of the entire capital, that the stock should be distributed between them in certain proportions, and that, if defendant should at any time sell or assign a certain amount of his stock, then he would transfer to plaintiff the residue, so as to give plaintiff a majority of the stock, does not mean that defendant must sell the specified amount of his stock at one time, so as to entitle plaintiff to a transfer of the residue.

3. SAME—STOCKHOLDERS—ENJOINING ENFORCEMENT OF CONTRACT.
A stockholder cannot sue to set aside a contract between his corporation and another corporation, on the ground that the two had a common director, but such action can be maintained only by the corporation.

4. SAME—BY-LAWS—VALIDITY.
Under Laws 1848, c. 40, § 7, providing that the trustees of a corporation created thereunder shall have power to make such by-laws "as they shall deem proper, * * * not inconsistent with the laws of this state," the only ground on which a by-law can be judicially declared invalid is that it is inconsistent with the laws of the state.

5. SAME—INCONSISTENCY.
Whether a by-law may properly confer many and important powers on a single person is a question of expediency, and not of legality.

6. SAME—WITHDRAWAL OF ASSETS—POWERS OF EQUITY.
Equity has no power, at the instance of a stockholder, to take property from the corporate assets, on the ground that the corporation was not authorized to acquire and hold it, and to divide it among the stockholders.

Appeal from circuit court, Albany county.

Action by I. Townsend Burden against James A. Burden, John L. Arts, Richard Irvin, Jr., Nicholas J. Cable, and the Burden Iron Company. From a judgment in favor of defendants, plaintiff appeals. Affirmed.

The opinion of Mr. Justice EDWARDS at special term is as follows:

The careful examination by the court of the very voluminous testimony in this case, required for the purpose of making its rulings on four hundred propositions of fact and of law which have been submitted to it by counsel, was so large an expenditure of time that it must confine any further consideration of the questions presented to some of those which are deemed to be of the most importance, and to which many of those passed upon are only subsidiary. A part of the relief sought is to have the certificate of November 26, 1884, increasing the number of the trustees of the Burden Iron Company from three to five, adjudged to be invalid, and to restrain the additional trustees from exercising any of the functions of their office. I apprehend that the true solution of this question depends upon the construction to be given to the promoters' agreement, which was executed simultaneously with the certificate of incorporation of the Burden Iron Company. A brief history of the facts preceding and inducing this agreement and incorporation may render more intelligible some of the controverted questions: For several years prior to June 30, 1881, the plaintiff and his brother, the defendant James

A. Burden, had been engaged, as equal partners, in the manufacture of iron in the city of Troy, and owned a large and valuable property for the purposes of their business, besides two valuable mansion houses, known as "Woodside," and occupied by them as residences, a farm of about one hundred and seventy acres, and a large number of shares of stock in various corporations. Differences of opinion as to the management of the business arose from time to time between the brothers, which they unfortunately regarded as irreconcilable. In June, 1881, this uncontrolled feeling culminated in a determination on the part of James to dissolve the co-partnership, and such purpose was communicated, through counsel, to the plaintiff. To avoid an enforced dissolution, negotiations between them were instituted for the formation of a corporation, not only for the purpose of allaying the existing strife, but also, in case of its continuance, to preclude the disastrous results which were possible under the co-partnership. These negotiations resulted in the assent of the plaintiff to the terms and conditions persistently insisted on by James; but, notwithstanding the plaintiff's submission to the terms exacted was reluctant, the evidence clearly shows that it was with his full knowledge and appreciation of the possible consequences to himself. These terms were, in brief, that the entire partnership property should be transferred to a corporation to be organized, should be capitalized at two millions of dollars, and that the stock should be distributed between the two brothers and the defendant John L. Arts, and should be subject to the provisions contained in the following so-called promoters' agreement, which was executed by the two brothers and Arts on June 30, 1881: "For value received, it is agreed between the undersigned, who are the sole associates of the Burden Iron Company, that the stock of said company shall be taken, owned, and held as follows, to wit: James A. Burden shall take, own, and hold one thousand shares; I. Townsend Burden shall take, own, and hold nine hundred ninety-eight shares; and John L. Arts shall take, own, and hold two shares. The said James A. Burden agrees to and with the said I. Townsend Burden that, if he shall at any time sell or assign nine hundred ninety-eight shares of his said stock, then and in such case he will, without any consideration for the same, transfer the other two shares of his said stock to the said I. Townsend Burden, his executors, administrators, or assigns. All the profit arising from the business of the said corporation shall be divided equally between the said James A. Burden and I. Townsend Burden. The said Arts agrees, for himself, his executors and administrators, that in case of a sale of any or all of his said stock, that said James A. Burden and I. Townsend Burden shall be entitled to the same severally, share and share alike, at and for its par value; and in case either of them shall refuse, in writing, to make such purchase, then the other shall be entitled to his half, or the whole thereof, as he may elect. It is further agreed that said Arts shall not receive any dividends, income, or profit from the said corporation, or its business, but that in place thereof he shall have and receive a salary, to be fixed by the said board of trustees of said corporation." On the same day James A. and I. Townsend Burden and John L. Arts, who executed the foregoing agreement, duly executed, acknowledged, and filed a certificate, in the form required by statute, whereby the Burden Iron Company was incorporated under the general manufacturing act of 1848. This certificate set forth that the signers had associated as a manufacturing corporation to continue for the period of fifty years; that the corporate name is the Burden Iron Company; the amount of capital stock two millions of dollars, divided into two thousand shares of one thousand dollars each; that the number of trustees is three; that the names of the trustees who will manage the affairs for the first year are James A. Burden, I. Townsend Burden, and John L. Arts; and the operations of the corporation are to be carried on in the city of Troy. Thereupon all the partnership property of James A. and I. Townsend Burden was transferred by them to the corporation, and it issued its two millions of stock therefor to the said promoters and incorporators, in the proportions provided for in the promoters' agreement; and they continued to be the sole stockholders and trustees until about November 22, 1884, when the defendant James A. Burden transferred one of his shares of stock to each of his brothers-in-law, the defendants William Irvin and Richard Irvin.

Jr. On November 26, 1884, the defendants Burden and Arts, two of the three trustees, under the statute providing for an increase of the number of trustees, executed and filed a certificate increasing the number from three to five, by the addition of the said William Irvin and Richard Irvin, Jr.

The plaintiff contends that this increase should be adjudged to be invalid, and that the additional trustees should be enjoined from exercising any powers as trustees of the corporation. On the motion made by the plaintiff for a temporary injunction, at a special term held by Mr. Justice Peckham, the only ground on which the increase of the number of trustees was claimed to be illegal was that the certificate was not made at a meeting of the board of trustees of which the members had notice. The learned justice held that the statute providing for an increase of the number of trustees is complied with if the certificate is signed and acknowledged by a majority of the existing trustees, without any meeting of the board of which the members have notice. While the plaintiff does not abandon the ground taken by him at special term, he now bases his claim on the further ground that the increase is in contradiction of the promoters' agreement, which, he maintains, is binding on the corporation. I shall, of course, follow the opinion of Judge Peckham, and hold that a meeting of the board, on notice to the members, was unnecessary, and shall consider only the other ground now urged by the learned counsel. While a preliminary agreement binds the individuals who make it, it is not necessarily binding on the corporation which it calls into existence; but if such agreement contains nothing in violation of a statute, or against public policy, it may become the contract of the corporation by adoption. Here the promoters and the incorporators were the same persons, were the only stockholders and trustees, and so continued for more than three years. The stock was issued and distributed, and the dividends were made, in accordance with the provisions of the agreement, which was one that might lawfully be made. Under these circumstances, I think it cannot be disputed that the agreement is binding on the corporation, and should be read and construed in connection with the certificate.

The question then becomes one of interpretation. The contention of the plaintiff is that, under the agreement, James was prohibited from transferring the two shares of stock to William Irvin and Richard Irvin, Jr., who took it with this infirmity, and therefore were ineligible as trustees. He maintains that it was contemplated and intended by the provisions of the agreement that James could not sell a part of his stock to outside parties unless he sold, at one time, nine hundred and ninety-eight shares, but that he must hold his thousand shares until he desired to retire from the business, when he must sell, at one time, nine hundred and ninety-eight shares to other parties, and the remaining two shares to the plaintiff. Is this the proper construction of the agreement? Undoubtedly, the instrument must be so construed as to effectuate the intention of the parties, but such intention must be ascertained from the language employed; and, when this is ambiguous, extrinsic testimony may be resorted to as an aid to interpretation. It should also be borne in mind that the right of alienation is such a necessary incident of ownership that no restraint can be imposed upon it, except in language clear and explicit. The counsel for the plaintiff maintains that their theory derives support from the words, in the second clause of the agreement, "who are the sole associates of the Burden Iron Company." But I think these words have no doubtful significance. They clearly, although superfluously, state a fact. The parties were "the sole associates of the Burden Iron Company," but to say that it was an agreement that they should continue to be "the sole associates" would be not only an unnatural construction, but one in conflict with the subsequent provisions of the agreement. The agreement then provides for the manner in which the stock shall be issued and distributed, and says that "James A. Burden shall take, own, and hold one thousand shares." I do not see how the word "hold," as here used, can reasonably be understood to be a restraint upon his disposition of the stock. That the word was here intended to have its ordinary legal import is evinced by the subsequent clauses providing for the manner in which his stock might be disposed of. Furthermore, precisely the same words are employed in respect to the shares to be issued to the plaintiff and to the

defendant Arts, and the agreement is silent as to any right of the plaintiff to sell, while it expressly provides for the manner in which Arts may dispose of his shares. The words "take, own, and hold" are here obviously used synonymously. They only mean that the stock shall be issued to the two brothers and to Arts in the proportions therein provided, and are not intended as a restraint upon the power of alienation. The plaintiff's counsel base their contention very largely on the next clause in the agreement, which reads as follows: "The said James A. Burden agrees to and with the said I. Townsend Burden that, if he shall at any time sell or assign nine hundred ninety-eight shares of his said stock, then and in such case he will, without any consideration for the same, transfer the other two shares of his said stock to the said I. Townsend Burden, his executors, administrators, or assigns." The plaintiff emphasizes the words "at any time," and maintains that this clause prohibited 'James from selling any part of his stock unless he sold at one time nine hundred ninety-eight shares, or, in other words, that he could not sell the nine hundred ninety-eight shares to outside parties, in different lots, at different times. I do not think the clause is fairly susceptible of such a construction. It is an unreasonable one. According to this theory, here was a man, owning one-half of the partnership property, to be vested with the ownership of one-half of the stock, which represented property worth over two millions of dollars, and which probably constituted the bulk of his property, agreeing not to dispose of any of his holdings unless he found a purchaser to take the whole. Furthermore, what was to become of the corporation, with only two trustees, instead of at least three, as required by statute, at any time when Arts should become dissatisfied with his salary, and elect to sell his two shares to the plaintiff and to James, if the plaintiff should not choose to sell any of his shares, and James had not the power to do so, to an outside person to make him eligible as trustee? Such an emergency might arise at any time after the formation of the corporation. It is very evident that, if the intention was to prohibit James from selling his stock unless he sold it all at one time, it would have been expressed in very explicit language, and we would not have been left to spell out such intent from the words "at any time." I think the reasonable interpretation of this provision is, not that James shall not dispose of less than nine hundred ninety-eight shares "at any time," but that, "at any time" when James shall have disposed of nine hundred and ninety-eight shares, he shall transfer the remaining two shares to Townsend. I think the purpose of this clause was to provide against a majority interest being created against Townsend in case James should desire to retire from the business. It was to give Townsend, in that event, the same advantage of holding half of the stock that James then possessed. The conclusion which I have reached not only gives to the language of the agreement its natural import, but is, I think, more in consonance with the facts and circumstances which led up to the agreement; and, while I do not deem it material, it appears to be more in accord with the plaintiff's understanding, as expressed in his letters to James of June 25, 1881, and November 6, 1882,—the former six days before, and the latter, sixteen months after, the formation of the corporation. In the former letter, urging that a corporation be organized, he says: "Under a corporation, you could sell your stock in small lots more readily, and probably for more money, than you could your half interest in the firm." And in the latter he says, "Who would buy any of your stock, or mine, at any price, if they knew the company was carrying on these fancy farms?" I am aware that the remaining provision of the agreement, that "all the profits arising from the business of the said corporation shall be divided equally between the said James A. and I. Townsend Burden," literally construed, is entirely in harmony with the view I have taken as to the power of James to sell to outsiders a part of his nine hundred and ninety-eight shares. When the agreement and certificate of incorporation were made, I think, neither of the brothers had any intention of selling any of his shares; and this provision was designed to secure to them, equally, all the profits, so long as their holdings of stock remained the same. The provision applied to Townsend as well as to James, and it is not claimed that Townsend was prohibited from selling any of his stock. The brothers equally owned the property transferred,

and for which one thousand shares were issued to James, nine hundred and ninety-eight to Townsend, and two to Arts. Arts was to have no dividend on his shares, but a salary in lieu of them. It was but equitable, therefore, that the profits or dividends should be equally divided between the brothers so long as the situation remained unchanged; and that is, I think, what the parties understood to be the meaning of this somewhat doubtful provision. I am of opinion, therefore, that the transfers by James to William and Richard Irvin, Jr., were legal, and the increase of trustees is valid. The transfers of the two shares to the Irvins were without consideration, but, except as against creditors, a completed gift of stock vests the title in the donor as absolutely as does a purchase.

Another question in the case arises out of the purchase by the Burden Iron Company of the ore of the Hudson River Ore & Iron Company for use in the manufacture of pig iron. Of the $1,500,000 of stock of the last-named corporation, James owns about $400,000, Arts $22,000, and the plaintiff none. James is also one of the directors. In April, 1893, the Burden Iron Company began to buy this ore to mix with other ores in the production of pig iron in its blast furnaces, and the proportion of such ore in the mixtures used has increased from five to fifty per cent. It is claimed by the plaintiff that the defendants Burden and Arts, for the purpose of furthering their interests as stockholders in the Hudson River Ore & Iron Company, have persisted, against the protests of the plaintiff, in buying the ore of that company, to the detriment of the plaintiff and of the Burden Iron Company, and that the defendants should be permanently enjoined from the purchase or use of such ore. A vast amount of testimony has been taken as to the relative value and productiveness of this ore in the manufacture of pig iron, and as to the alleged wrongful purpose of Burden and Arts in its purchase; and, after a careful examination, I have reached the conclusion that such ore was purchased and used in the exercise of their best judgment, without bad faith, and without any pecuniary injury to the plaintiff as a stockholder in the Burden Iron Company. But the plaintiff contends that, irrespective of any actual fraud in the purchase, he is entitled to the relief sought, for the reason that James A. Burden is a director in both corporations, and that such purchases are therefore within the condemnation of the law. He invokes the settled rule of law which declares voidable all contracts made between two corporations having one or more common directors. It is familiar doctrine that a contract made by an agent or trustee is voidable, at the election of the principal or person represented, in all cases where the fiduciary has any personal interest in the contract. The law does not permit one to act in the dual character of principal and agent, and when one assumes such a character it declares the transaction invalid, at the election of the person represented, without regard to the question whether it was fair or otherwise. This principle of agency applies, not only to a contract between a director and the corporation which he represents, but also to contracts between two corporations having common directors; and this notwithstand : that a majority of the directors of each corporation, exclusive of the common directors, voted for the contract. A trustee represents the corporation, and he cannot have two principals without conflicting interests. There can be no divided allegiance. Munson v. Railroad Co., 103 N. Y. 58, 8 N. E. 355; Metropolitan El. Ry. Co. v. Manhattan Ry. Co., 14 Abb. N. C. 251. I think there can be no doubt that the law would set aside, or refuse to enforce, at the instance of either of these corporations, an executory contract between them for the sale of ore, on the sole ground of the two corporations having a common director. But will the law, on that ground, interfere at the instance of a stockholder? On principle, as well as authority, I think not. All the authorities hold that such a contract is not void, but is voidable only, at the election of the principal. The director holds a fiduciary relation to the corporation, and with the corporation rests the election to disaffirm. If the right to disaffirm rests with a stockholder, then, however small his holdings may be, he can nullify the contract, however beneficial it may be to the corporation, and however subversive may be his conduct of the will and interests of a majority of the stockholders. Stockholders act through directors who represent the corporation. If the majority stockhold-

ers deem the contract unwise, and desire to disaffirm, they may elect a board of trustees, who will execute their wishes; and, if they deem it otherwise, there is no reason why a single stockholder, or the minority stockholders, should be permitted to subvert their wishes. In Wallace v. Railroad Co., 12 Hun, 460, the plaintiffs, who were stockholders in the defendant corporation, which had taken a lease of two other roads,—some of the directors of the defendant being also directors of the leased roads,—sought to enjoin the carrying out of the lease. The court, by Gilbert, J., says: "I cannot say that the directors of the Long Island Railroad Company have abused the power mentioned, or that they fraudulently entered into the leases in question. They may have erred in judgment, but the court has no power to control the lawful exercise of the discretion vested in them as officers of the corporation. I see no reason for imputing to them bad faith or fraud. That being so, I am of opinion that a stockholder in that company is not entitled to have the leases avoided, in opposition to the wishes of the parties to them. The directors are, no doubt, in one sense, trustees of the corporation. If the corporation, acting with the approval of the holders of the major part of the stock thereof, prefer to abide by the leases, they cannot be avoided on the complaint of a minority of the stockholders, against the will of the corporate body so manifested; and, in absence of evidence that the holders of the major part of the stock disapprove the acts of the directors, their approval thereof must be presumed. In other words, the leases in question, although infra vires, may be voidable at the election of the corporation. But the plaintiffs are not entitled to make such election in behalf of the corporation. * * *"

The rule that persons acting in a fiduciary capacity shall not directly or indirectly make any profit by means of such acts, or be interested in contracts made by their principals, undoubtedly applies to directors of corporations. It is a valuable principle, and ought not to be impaired by any subtle or refined distinctions. Still, the mere fact that the same persons were directors of the corporation which made the lease, and of that which took it, is not of itself sufficient to avoid the contract, at the instance of one or more stockholders, against the will of the corporation. That fact alone might entitle either corporation to avoid the lease, but I apprehend it does not give the right to a stockholder. In the cases cited in behalf of the plaintiff, and in all the cases I have met with, where the contracts have been avoided on that ground, the relief was sought or asserted by the corporation. There is a class of cases, to which these cited by the plaintiff's counsel belong, where the acts of the directors are fraudulent, and an injury to the corporate property, in which it is held that an action may be maintained at the instance of an aggrieved stockholder. But this case does not belong to that class. The distinction between the two classes of cases is observed in MacNaughton v. Osgood, 41 Hun, 109. There the action was brought by a stockholder of the defendant corporation to restrain the payment of salaries which the three trustees had voted to themselves as officers of the corporation. The court held that the contract was not void, but voidable only, at the election of the corporation; that the plaintiff, as a stockholder, could not maintain the action without showing dishonesty on the part of the directors, and an injury to the corporate estate; that it was not sufficient for him to show the fiduciary relations of the directors, and that they had adopted the resolutions in which they were personally interested, as it was not clear from the simple fact that the directors voted to themselves salaries, and received them, that the corporation had been injured. At the close of the opinion, Landon, J., says, "There is a plain distinction between a case in which the corporation may, at its own option, avoid such a contract, and a case in which the corporation, from the fact that it is despoiled and in the hands of its spoilers, ought to be adjudged to avoid it."

The plaintiff has assailed the validity of by-law No. 11, adopted at a meeting of the board of trustees of the Burden Iron Company on February 27, 1885. His counsel contend that it is unreasonable, in excess of the corporate power, and void. The court is asked to adjudge it to be illegal, and to enjoin the defendants from acting under it. Assuming the by-law to be void,

I have very grave doubts whether the plaintiff, on that ground, can maintain the action. I know of no authority which permits one to bring an action to annul a by-law on the ground of its alleged invalidity. It is only where an attempt is made to enforce it to his detriment that the question of its validity can properly be raised for adjudication. Neither can he invoke equitable relief unless there is reason to apprehend some irreparable injury, which I think the plaintiff has failed to show in this case. But the conclusion at which I have arrived in respect to the validity of the by-laws renders unnecessary any discussion of that question. Section 7 of chapter 40 of the Laws of 1848, under which act the Burden Iron Company was incorporated, provides as follows: "The trustees of such company shall have power to make such prudential by-laws as they shall deem proper for the management and disposition of the stock and business affairs of such company, not inconsistent with the laws of this state, and prescribing the duties of officers, artificers, and servants that may be employed." This statute has wisely confided to the "trustees" of the corporation power to make such by-laws for the management of the business affairs and prescribing the duties of officers as "they shall deem proper." The only restriction that the section imposes is that the by-laws be "not inconsistent with the laws of this state," and I do not think that the court can impose any further limitations on the power of the trustees. Whatever may have been the common-law doctrine in respect to the power of the court over by-laws enacted by corporations as one of their incidental powers, I cannot conceive how, under this statute, the court can pursue its investigation of the validity of a by-law further than to inquire whether it is "inconsistent with the laws of this state." The question of the wisdom or expediency of a by-law is quite foreign to a proper judicial inquiry. The law has wisely left that question to the better judgment of the trustees. A motion was made, at a special term held by Mr. Justice Peckham, for a preliminary injunction restraining the defendants from acting under by-law No. 11, as adopted November 20, 1884, which was subsequently rescinded, and of which the one of February 27, 1885, is conceded to be substantially a re-enactment. The motion was denied, and the learned judge, in his opinion, says: "The by-law may perhaps be no more than the due exercise of the power of internal administration, and if so it rests necessarily with the majority of the stockholders, and so 'long as they act with good faith, and do not go beyond the capacities of the corporation, as fixed by its charter, the minority must submit. The courts do not interfere unless the corporation, or a majority, may be about to do some act outside of the scope of its or their authority, or in disobedience to its charter. Otherwise, as I have said, the position of the minority of the shareholders must be that of submission." It cannot be doubted that this by-law is what the judge there aptly characterizes as "a most extraordinary enactment." The powers delegated by it to the general manager are many and broad, but the question to be determined is whether the delegation of such powers was within "the scope of their authority." The doctrine of a by-law being void because unreasonable, as applied when an attempt has been made to enforce it against a third person, has no application to a question of delegation of authority under the statute, and I think that no case can be found where a delegation of power has been held to be invalid because it was deemed to be unreasonable. The object and effect of this by-law was to create an agency in the general manager, and the only question for the consideration of the court is whether the authority with which he is clothed is such as the board has power to confer. A board of trustees cannot carry on the business of the corporation, except through the instrumentality of agents of its appointment. It is true that the law has confided to the board the management of the affairs of the corporation, but it is not a relinquishment of such management to confer their power and authority on agents who are subject to their control, and I am of opinion that the board does not act outside of the scope of its authority when it delegates to its agents power to perform any act which the board itself can legally perform. This doctrine is expressed and illustrated in Hoyt v. Thompson's Ex'r, 19 N. Y. 216, where the court, by Judge Comstock, says: "The board of directors of a corporation do not stand in the same relation to the corporate body which a private agent

holds towards his principal. In the strict relation of principal and agent, all the authority of the latter is derived by delegation from the former; and, if the power of substitution is not conferred in the appointment, it cannot exist at all. But in corporate bodies the powers of the board of directors are, in a very important sense, original and undelegated. The stockholders do not confer, nor can they revoke, those powers. They are derivative only in the sense of being received from the state in the act of incorporation. The directors, convened as a board, are the primary possessors of all the powers which the charter confers; and, like private principals, they may delegate to agents of their own appointment the performance of any act which they themselves can perform. The recognition of this principle is absolutely necessary in the affairs of every corporation whose powers are vested in a board of directors. Without it, the most ordinary business could not be carried on, and the corporate powers could not be executed." In that case the validity of an assignment of a bond and mortgage of $60,000, which had been executed to the Morris Canal & Banking Company, was questioned on the ground that it was without the authority of the board of directors. The charter fixed the number of directors at twenty-three, and declared that the corporate powers of the company should be exercised by the board. Authority was given to establish such by-laws, ordinances, and regulations as should be deemed necessary or convenient for the transaction of its business. One of the by-laws adopted provided that five directors, including the president, should form a quorum for the transaction of the ordinary business of the company. An agreement was made with the state of Michigan, among other things, providing for a transfer to it by the corporation of between $500,000 and $600,000 of securities, including the bond and mortgage in question; and said agreement was executed, and the bond and mortgage assigned, in pursuance of a resolution passed at a meeting of five directors and the president. The court says: "The first inquiry suggested by the facts stated is whether the by-law of the company authorizing a quorum of five directors, including the president, to transact ordinary business, was a valid regulation. We are clearly of the opinion that it was. The charter of the company, it is true, declared that its powers should be exercised by a board of twenty-three directors, and it may well be conceded that, in the absence of any different regulations, a majority of the whole number would be necessary to constitute a legal quorum for the transaction of any business whatever. But it would be a very extraordinary construction of the charter in this respect to hold that the board of twenty-three directors, or a majority thereof, must meet and act whenever any corporate power was to be exercised, and that no delegation of authority could be made to subordinate agents, to committees, or to a quorum consisting of a smaller number." The court then proceeds, in the language which I have first above quoted, to say that the "powers of a board of directors are not derived from the stockholders, and, like principals, they may delegate to agents of their own appointment the performance of any acts which they themselves can perform." It rests its decision that the by-law was valid on the doctrine of the power to delegate authority. It says of the by-law: "It was, in substance and effect, a regulation which constituted a subordinate agency to conduct the ordinary business of the corporation." To the distinction made by plaintiff's counsel, that the by-law there held to be valid delegated to transact only the "ordinary" business of the corporation, I think it an answer that the court, in considering that question, says, "The ordinary business of the corporation had, I think, no limit, short of the varied and extensive affairs in which it was authorized by its charter to engage." The court below gives the same construction to the words "ordinary business." Hoyt v. Sheldon, 3 Bosw. 290.

In Palmer v. Yates, 3 Sandf. 137, the North American Trust & Banking Company, in pursuance of a statute which authorized it to make such by-laws for the management of its business as it might think expedient, adopted by-laws whereby the entire business which it was authorized to transact was divided into two departments, and a committee was appointed for each department, with exclusive charge of that department, with all the powers of the board; and the by-law was held to be valid. Tested by these principles,

it seems to me very clear that in enacting the by-law in question the board of trustees were acting within the scope of their authority. The first clause gives to the manager the general management of the works and of the business of the company, while the following clauses contain specifications of what is intended to be embraced within the first. I think it would be impossible to point out—and plaintiff's counsel had not attempted to do so— a specific thing contained therein which the trustees could not authorize an agent to do. The by-law has been assailed because it confers so many and so important powers on a single person, but I think that it is a question of expediency, and not of legality. If, by a resolution, the board could authorize the general manager to do any of these acts at a particular time,—a proposition which no one could well deny,—could it not, by a resolution or by-law, authorize him to do that act at all times? And if it may authorize him to do one of the specific acts therein mentioned at all times, may it not authorize him to do all them at all times, so long as they are all acts whose performance the board can delegate to an agent? If the present board of five members should rescind the obnoxious by-law, and adopt one whereby all the powers now delegated to the general manager were distributed among the five members. or among five agents appointed by the board, I think no one would claim that the by-law was void. But, if it may legally delegate these powers to five, I see no reason why it may not just as legally confer them upon one. The distribution of the powers might be deemed to be wiser, but, as I have said, the question is not whether the by-law is one that a court of equity could make, but whether it is one which the trustees, in the exercise of the discretion vested in them, had the power to make, and if so the court should not interfere.

The plaintiff also asks for a judgment of the court directing that the Woodside houses and grounds, and the adjoining farm, together with the stocks in other corporations held by the Burden Iron Company, be withdrawn from and taken out of the assets and property of the corporation, and that a division thereof be made between the plaintiff and the defendant James A. Burden. The ground for the relief is that this is property which the corporation was not authorized to acquire and hold. Assuming this ground to be correct, I have not been referred by the learned counsel for the plaintiff to any authority, and I am satisfied from my examination that none exists, which authorizes a court of equity, for such reason, at the instance of a stockholder, to take the property from the corporate assets, and divide it among the stockholders. I think it well settled that a conveyance to a corporation of property which it is incompetent by its charter to take is not void, but voidable only, and the state alone can object. The conveyance vested the legal title in the corporation. and the sovereign alone can divest it. Furthermore, the granting of the request would be in violation of the doctrine that courts will not afford relief to a stockholder against the unauthorized acts of a corporation to which he has consented, and in which he has participated. All of this property, of the value of at least $700,000, originally belonged to the plaintiff and to the defendant Burden equally, as partners. It is not denied that when negotiations for organizing the corporation were pending the defendant Burden insisted, as one of the conditions, that this property should be transferred to the corporation; that the plaintiff yielded his assent. and united with his brother in transferring this, together with all their other partnership assets, to the corporation, for which the plaintiff received, and still retains, his agreed proportion of the capital stock. The plaintiff cannot now be heard to object that the contract and performance were not within the legitimate powers of the corporation, without a palpable violation of a plain principle of equity. To the suggestion that the property may be divided as profits, it is sufficient to say that it is capital, and not profits; and, furthermore, profits can be divided in the form of dividends only, the time, amount, and kind of which are within the discretion of the board of trustees.

But while the court has no power to withdraw the real estate from the corporate assets, it has the power, and I think it is its duty. to enjoin the further diversion of the corporate funds thereof on what is known herein as "fancy farming." The testimony shows that since the corporation was or-

ganized a very large amount of money out of the treasury has been expended on the Woodside farm, in the maintaining of conservatories, the cultivation of plants and.flowers, and the raising of blooded stock. This was begun while the brothers were partners, and was carried on for the gratification of the tastes of both, and with their mutual consent. It was continued under the corporation, and for about a year with the consent, or at least with the acquiescence, of the plaintiff, when he began to manifest his disapprobation; and he has since that time, orally, by letter, and by resolution, protested against the further expenditure of the corporate funds for this purpose. On July 19, 1883, at a meeting of the board of trustees at which all the members were present, he offered the following resolution: "Resolved, that it is inexpedient for the company to continue the business and attending expense of what is known as 'fancy farming,' as heretofore carried on before the formation of the company, and that it be discontinued altogether from and after this date." He urged the board to entertain and adopt this resolution, and it refused. The business was still being carried on, and the expenses defrayed from the treasury of the corporation, when the action was commenced; and this is the cause of action set forth in paragraph 17 of the complaint, and to restrain the continuance of these acts is part of the relief demanded. That this is an illegal diversion of the funds of the company is conceded. So long as the stockholders consented, there was no substantial objection to these brothers gratifying their tastes at the expense of the company; but, as soon as either of them dissented, it was the legal duty of the corporation to immediately cease the practice. There can be no doubt that under the copartnership, as for some time under the corporation, this practice was as acceptable to the plaintiff as to his brother, but there came a time when he chose to dissent. His motives for doing so have been criticised, but it is the duty of the court to determine the various questions in this case, not on those ethical principles which should control the conduct of brothers, but according to the rules of law applicable to corporations. The plaintiff has a legal right to object, and he exercised that right. It is true that after the intimation of the court in its opinion on the motion for a temporary injunction there was a cessation of this practice, and it has not been resumed, but I do not think this furnishes an adequate reason for not enjoining its continuance or resumption. When the plaintiff offered before the board his resolution for its discontinuance, and urged its adoption, it was unquestionably its duty to adopt it. But it refused, and the practice was in existence when the action was commenced; and I can conceive of no sufficient reason why the plaintiff should not now be secured in his right, and not be left to another application for an injunction in case of the resumption of the practice. I am of opinion that upon the proofs now before the court, within the decision of Judge Peckham, as well as upon principle, the plaintiff has a clear right to this relief, the form of which will be determined on the settlement of the judgment. On the other causes of action contained in the complaint, the defendants are entitled to judgment.

Argued before PARKER, P. J., and MAYHAM, HERRICK, PUTNAM, and MERWIN, JJ.

Henry A. King (Joseph H. Choate and Edwin Countryman, of counsel), for appellant.

R. A. Parmenter (Esek Cowen and James C. Carter, of counsel), for respondents.

PER CURIAM. Judgment affirmed, with costs, on opinion of court below.